**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| RAJINDER PAUL, Derivatively on Behalf of AST SPACEMOBILE, INC.<br><br>Plaintiff,<br><br>v.<br><br>ABEL AVELLAN, ANDREW JOHNSON, ADRIANA CISNEROS, LUKE IBBETSON, EDWARD KNAPP, KEITH LARSON, HIROSHI MIKITANI, RONALD RUBIN, RICHARD SARNOFF, JULIO A. TORRES, and JOHAN WIBERGH,<br><br>Defendants,<br><br>and<br><br>AST SPACEMOBILE, INC.<br><br>Nominal Defendant. | Case No: 7:26-cv-00446<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rajinder Paul ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of AST SpaceMobile, Inc. ("AST SpaceMobile" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and hers own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) the Individual

Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6. ***Plaintiff*** is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. ***Nominal Defendant AST SpaceMobile*** is a Delaware Corporation with its principal executive offices located at Midland Intl. Air & Space Port 2901 Enterprise Lane Midland, Texas 79706. AST SpaceMobile's shares are traded on the Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "ASTS."

### Director Defendants

8. ***Defendant Abel Avellan*** ("Avellan") founded the Company and has served as the Company's CEO and as Chairman of the Board since 2021. Defendant Avellan is also a member of the Network Planning and Spectrum Committee.

9. ***Defendant Andrew Johnson*** ("Johnson") has served as the Company's CLO since May 2024 and as the Company's CFO since June 2024. He has also served as a Company director since January 2025.

10. ***Defendant Adriana Cisneros*** ("Cisneros") has served as a Company director since April 2021. She also serves as the Chair of the Compensation Committee and the Redemption Election Committee and as a member of the Nominating and Corporate Governance Committee.

11. ***Defendant Luke Ibbetson*** ("Luke") has served as a Company director since April 2021. He also serves as a member of the Network Planning and Spectrum Committee.

12. ***Defendant Edward Knapp*** ("Knapp") has served as a Company director since April 2021. He also serves as a member of the Network Planning and Spectrum Committee.

13. ***Defendant Keith Larson*** ("Larson") has served as a Company director since January 2025. He also serves as a member of the Network Planning and Spectrum Committee.

14. ***Defendant Hiroshi Mikitani*** ("Mikitani") served as a Company director from April 2021 to January 13, 2026.

15. ***Defendant Ronald Rubin*** ("Rubin") has served as a Company director since April 2021. He also serves as a member of the Audit Committee.

16. ***Defendant Richard Sarnoff*** ("Sarnoff") has served as a Company director since April 2021. He also serves as Chair of the Nominating and Corporate Governance Committee.

17. ***Defendant Julio A. Torres*** ("Torres") has served as a Company director since April 2021. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

18. ***Defendant Johan Wibergh*** ("Wibergh") has served as a Company director since June 2024. He also serves as the Chair of the Network Planning and Spectrum Committee and as member of the Audit Committee and the Compensation Committee.

19. The above-referenced defendants are collectively referred to herein as the "Director Defendants" or the "Individual Defendants."

20. Separately, Defendants Avellan and Johnson are collectively referred to herein as the "Officer Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21. AST, together with its subsidiaries, designs and develops the constellation of BB satellites in the U.S. The Company provides a cellular broadband network in space for direct access by smartphones for commercial use and other applications, as well as for government use. In addition, its SpaceMobile service provides cellular broadband services to end-users who are out of terrestrial cellular coverage.

22. At all relevant times, the Individual Defendants touted AST's purportedly unique competitive advantages and leadership position in the satellite D2C market. In particular, the Individual Defendants touted AST's business and financial prospects as purportedly the only established space-based cellular broadband network for mobile phones.

23. The Individual Defendants' assurances regarding AST's purportedly durable competitive position in the satellite D2C market came into question in September 2025, when EchoStar announced that it had entered into a definitive agreement with SpaceX to sell its AWS-4 and H-block spectrum licenses. In connection with the EchoStar Transaction, SpaceX and EchoStar agreed to enter into a long-term commercial agreement, enabling EchoStar's Boost Mobile subscribers—through its cloud-native 5G core—to access SpaceX's next generation Starlink D2C service.

24. SpaceX commands a dominant position in the global aerospace and orbital launch industry, with the ability to produce numerous satellites at scale. Its telecommunications subsidiary Starlink provides a broadband internet satellite constellation that accounts for roughly 54% of all

active satellites in Earth's orbit, with approximately 9,821 Starlink satellites currently active in LEO. Viewed in combination with its considerable resources, SpaceX's entry into the satellite D2C market was potentially a threat to AST's commercial aspirations.

25. Following the EchoStar Transaction, however, the Individual Defendants continued to assure investors and the market that AST remained in a competitive class of its own, with the Company poised to realize significant revenues and profits in the near-term. Likewise, the Individual Defendants continuously represented that AST's capital and liquidity position was sufficient to meet its strategic and business goals at all relevant times, notwithstanding the heightened competitive pressures it faced following the EchoStar Transaction.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

26. On March 3, 2025, during post-market hours, AST issued a press release providing a business update and fourth quarter ("Q4") and full year ("FY") 2024 results. The press release quoted Defendant Avellan as stating:

> [W]e enter 2025 ***even better positioned to lead the emerging direct-to-device satellite communications industry that we invented*** . . . . The many pieces of our plan are ***rapidly coming into place***. ***We advanced our customer ecosystem, formalized definitive commercial agreements, and expanded our U.S. Government capabilities.*** Finally, we completed a carefully structured financing transaction with minimal dilution to current shareholders, ***enabling us to accelerate our manufacturing efforts and start 2025 stronger than ever***.[]
>
> []***With nearly $1.0 billion in cash on our balance sheet*** pro forma for the recent offering of convertible notes, ***an alliance of industry leading partners, and our proprietary technology, we are well-positioned for continued success*** . . . . We are laser-focused on building and deploying satellites and expanding our commercial agreements during 2025, moving toward commercial-scale revenues. Our vision has never been clearer, and we believe ***we have the resources and capabilities to execute our plans***.

27. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, "[s]ignificant advancement in

commercialization of SpaceMobile network with new commercial agreements with Vodafone and the U.S. Government", "full operational status for first five BlueBird commercial satellites, each the largest-ever commercial communications arrays deployed in low Earth orbit", "[a]ccelerated satellite manufacturing", an "agreement for long-term access to up to 45 MHz of premium lower mid-band spectrum in the U.S. for direct-to-device applications", and a "[r]obust balance sheet with nearly $1.0 billion in cash, cash equivalents, and restricted cash (as of December 31, 2024), pro forma for convertible notes offering[.]"

28. Also on March 3, 2025, during post-market hours, AST filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K touted various competitive advantages AST purportedly enjoyed, including a "Large Addressable Market", "Delivery of Cellular Broadband Coverage at a Competitive Cost", "Definitive Commercial Agreements with MNOs [Mobile Network Operators] Enabling Access to Key Markets and Potentially Large Number of Subscribers", "Cellular Broadband Directly to Unmodified Devices", "Satellites Designed for Great Functionality, Power and Redundancy", "Cost Advantages due to Greater Control of our Manufacturing", and the "Capability to Support Both Commercial and Government Applications on the Same Satellite or on a Singular Infrastructure[.]"

29. The 2024 10-K also stated that "[w]e believe our cash and cash equivalents on hand and our ability to raise capital through access to the 2024 ATM Equity Program will be sufficient to meet our current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Annual Report."

30. Appended as exhibits to the 2024 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Officer Defendants certified that the 2024 10-

K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

31. On April 25, 2025, Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh solicited the April 2025 Proxy Statement, which contained material misstatements and omissions.

32. The April 2025 Proxy Statement called for the Company's shareholders to vote to, among other things: (i) re-elect Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres and Wibergh to the Board; (ii) approve an amendment to the Company's Second Amended and Restated Certificate of Incorporation permitting Company stockholders to take action, by written consent, for the purpose of removing directors; (iii) approve, on an advisory basis, the compensation paid to the Company's named executive officers; and (iv) approve, on an advisory basis, the frequency of future advisory votes regarding the compensation of the Company's named executives.

33. Regarding the Company's Code of Conduct and "Corporate Governance Framework", the April 2025 Proxy Statement stated the following:

> The Board has adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that, along with the Company's Second Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"), our Amended and Restated Bylaws ("Bylaws"), the charters of the committees of the Board (the "Committees") and our Amended and Restated Stockholders' Agreement (the "Stockholders' Agreement"), provide the framework for the governance of the Company. Our Code of Ethics applies to all of our directors, executive officers and employees, including our principal executive officer, principal financial officer,

> principal accounting officer and persons performing similar functions. The Code of Ethics is available on our corporate website at https://investors.ast-science.com. We intend to make any legally required disclosures regarding amendments to, or waivers of, provisions of our Code of Ethics on our website rather than by filing a Current Report on Form 8-K. The charters for all of our Committees as well as our Corporate Governance Guidelines are also available under the "Governance" link under the heading "Investors" on our website at https://investors.ast-science.com.

34. Regarding the Company's "Risk Oversight," the April 2025 Proxy Statement stated the following, in relevant part:

> Our Board is responsible for overseeing our risk management process. Our Board focuses on our general risk management strategy, the most significant risks facing us, and oversees the implementation of risk mitigation strategies by management. While our Board is ultimately responsible for overseeing our risk management process, certain committees assist our Board in overseeing parts of our overall risk management and regularly reports to the Board regarding risk and the related risk management. During fiscal 2024, the Board's Committees assisted with the following responsibilities:
>
> • Audit Committee: Reviewing our accounting, reporting and financial practices, including the integrity of our financial statements and the oversight of our financial controls; and overseeing the Company's policies with respect to risk assessment and risk management, including overseeing management's implementation and execution of our cybersecurity risk management strategy and processes.
>
> * * *
>
> In addition, our Board receives periodic detailed operating performance reviews from management regarding certain risks and related management processes and procedures. The Board believes its current leadership structure enables it to fulfill its risk oversight function.

35. Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres and Wibergh caused the April 2025 Proxy Statement to be false and misleading by failing to disclosed, *inter alia*, that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than the Individual Defendants had signaled to investors; (ii) accordingly, the Individual Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its

strategic and business goals; (iii) the Individual Defendants likewise overstated the durability of AST's competitive position in the satellite D2C market; (iv) AST was experiencing slow user adoption in the U.S. and Japan; and (v) the foregoing was likely to have a significant negative impact on the Company's business and financial prospects.

36. The April 2025 Proxy Statement was also false and misleading because it failed to disclose that: (i) despite claiming its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (i) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

37. On the basis of the materially false and misleading 2025 Proxy Statement, shareholders voted to approve the re-election of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh to the Board, as well as approve executive compensation. Had shareholders known the truth—that the Board was not adequately overseeing risk and that the Individual Defendants were breaching their fiduciary duties to the Company—then they would not have voted to re-elect the individuals that were causing harm to the Company.

38. On May 12, 2025, AST issued a press release providing a business update and first quarter ("Q1") 2025 results. The press release quoted Defendant Avellan as touting, inter alia, AST's "expanded . . . U.S. Government opportunity and . . . position to start generating meaningful revenue during 2025."

39. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, a "multi-provider satellite orbital launch

plan with five contracted launches over the next six to nine months", "[a]dvanced SpaceMobile network commercialization efforts, with expected second half 2025 revenue opportunity of $50.0 million to $75.0 million", "strong progress on regulatory approvals and spectrum-related topics with partners and key industry groups", and a "[r]obust balance sheet with $874.5 million in cash, cash equivalents, and restricted cash as of March 31, 2025, with continued access to diverse capital markets[.]"

40. Also on May 12, 2025, AST filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q1 ended March 31, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q stated, *inter alia*, that "[w]e believe our existing cash and cash equivalents on hand will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report."

41. Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

42. On August 11, 2025, AST issued a press release providing a business update and second quarter ("Q2") 2025 results. The press release quoted Defendant Avellan as stating, in relevant part, that "we now have a path for premium spectrum on a global basis, which is uniquely valuable with our innovative technology backed by over 3,700 patent and patent pending claims to support up to 120 Mbps peak data rates per cell globally."

43. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, "[p]repar[ations] to deploy nationwide intermittent service in the United States by the end of 2025, followed by the United Kingdom, Japan, and Canada in Q1 2026", an "[e]xpanded spectrum strategy with agreement to acquire 60

MHz of global S-Band spectrum priority rights, augmenting existing 3GPP cellular spectrum strategy and strengthening position within wireless ecosystem", "[a]dvanced commercialization efforts with expansion of partnerships, derived from agreements with more than 50 mobile network operators globally, which have nearly 3.0 billion existing subscribers, while receiving additional U.S. Government contract awards", and "[o]ver $1.5 billion in balance sheet cash, cash equivalents, and restricted cash (as of June 30, 2025), pro forma for convertible notes offering and sales under the now terminated ATM facility[.]"

44. Also on August 11, 2025, AST hosted a conference call with investors and analysts to discuss its Q2 2025 results. During the call, an analyst asked, "given the current launch cadence and near-term goals, is your current funding runway sufficient to reach initial commercial revenue or do you foresee additional capital needs?" Defendant Johnson responded, in relevant part, that "[g]iven our pro forma balance sheet at the end of Q2 of over $1.5 billion, we do believe that we are fully funded now to reach the 45 to 60 satellite level and as part of that, our capital strategy going forward will be one focused not on threshold business delivery needs[.]"

45. The same day, AST filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q2 ended June 30, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q stated, *inter alia*, that "[w]e believe our existing cash and cash equivalents on hand will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report."

46. Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

47. The above-referenced statements were materially false and misleading as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, The Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than the Individual Defendants had signaled to investors; (ii) accordingly, the Individual Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals; (iii) the Individual Defendants likewise overstated the durability of AST's competitive position in the satellite D2C market; (iv) AST was experiencing slow user adoption in the U.S. and Japan; (v) the foregoing was likely to have a significant negative impact on the Company's business and financial prospects; and (vi) as a result, the public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

48. The truth began to emerge on September 8, 2025, when UBS issued a report during post-market hours downgrading AST to a "Neutral" from "Buy" recommendation, as well as cutting its PT on the Company to $43.00 from $62.00. The UBS report mostly cited heightened competitive pressures from Starlink following the EchoStar Transaction, which was announced earlier the same day, stating:

> **Starlink (AST's primary competitor) enhances positioning with spectrum deal**
> We are downgrading ASTS to Neutral from Buy and lowering our PT to $43 ($62 prior) . . . . [W]e believe Starlink's newly announced acquisition of Echostar's SBand spectrum for $19B fortifies its position in the space to cellular market and increases risk for ASTS as it drives utilization on its nascent constellation. We . . . now see a more balanced risk-reward with competitive concerns likely to persist. We are lowering our LT [long-term] utilization assumptions and now look for $383M of revenue/$82M of EBITDA in 2026 (unch.), scaling to $3.0B/2.4B in 2030 (vs. $3.6B/$2.9B prior and Factset consensus $3.7B/2.7B).

> **Still see room for multiple players in space to cellular but execution risk higher**
> While we still believe the market opportunity will support multiple players LT, we believe the newly announced spectrum deal between Echostar and Starlink enhances the positioning of ASTS' primary competitor and creates added execution risk. Starlink began targeting space to cellular service with new satellites in recent years, but we believe the spectrum transaction 1) signals Starlink's commitment to scaling in this market with a full broadband/voice solution leveraging multiple spectrum bands and 2) enhances its standing with more spectrum rights to pair with its launch capabilities. While certain direct to device carrier deals have exclusive elements initially, carriers could also increasingly explore working with multiple providers in time.
>
> **Lowering utilization assumptions and estimates**
> AST is targeting 5 launches by 1Q26 with 45-60 Block 2 satellites deployed by YE26, enabling continuous coverage in target markets. Our prior 2030 base case ($3.6B of rev) aligned with ~35% capacity utilization but we now look for $3.0B of rev/30% utilization given greater competition. This assumes a more gradual ramp in both carrier/gov't revenues (UBSe $2.3B/$700M in 2030 vs $2.8B/$800M prior), flowing through at high margin given high fixed costs.
>
> **Valuation: Lowering price target; downgrade to Neutral**
> We are lowering our PT to $43, based on 10x 2030E EBITDA (in-line with multiyr avg for public satellite comps) discounted back at 14%. Our prior PT was based on 12x 2030E EBITDA (discounted at 14%) or at the high-end of the peer avg historically but we believe a lower multiple is justified given increased competitive concerns.

49. Following the release of UBS's report, AST's Class A common stock price fell $3.86 per share, or 9.47%, to close at $36.91 per share on September 9, 2025.

50. Then, on October 21, 2025, during post-market hours, AST issued a press release "announc[ing] its intent to offer . . . $850.0 million aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", and that it "also intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150.0 million aggregate principal amount of Notes." The press release disclosed that AST intended to use the net proceeds from this offering "for general corporate purposes, including without limitation funding the deployment of AST SpaceMobile's worldwide constellation of satellites in anticipation of adding incremental strategic markets for its SpaceMobile Service."

51. The same day, also during post-market hours, AST issued another press release "announc[ing] the pricing of $1.0 billion aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", noting that "[t]he size of the offering has been increased from the previously announced $850.0 million principal amount of Notes", while reiterating the same intended use for the net proceeds from the offering.

52. Following these disclosures, AST's Class A common stock price fell $7.26 per share, or 9.24%, to close at $71.35 per share on October 22, 2025.

53. Despite the aforementioned declines in the Company's stock price, AST securities continued trading at artificially inflated prices because of the Individual Defendants' continued misstatements and omissions regarding, *inter alia*, AST's competitive position in the satellite D2C market, the sufficiency of its capital and liquidity position to achieve its strategic and business goals, and the overall pace of its user adoption.

54. For example, on November 10, 2025, AST issued a press release providing a business update and third quarter ("Q3") 2025 results. The press release quoted Defendant Avellan as stating, *inter alia*, that the Company "continues to lead the direct-to-device space-based cellular broadband industry," and that, "[d]uring the past few months, commercial activity has significantly accelerated, demonstrating the robust demand for our solution across the ecosystem."

55. The press release also touted various purported improvements to AST's commercial and financial position, including "[s]ignificant contract wins with the signing of definitive commercial agreements with stc Group and Verizon, as well as additional traction with U.S. Government customer", "over $1.0 billion in aggregate contracted revenue commitments from partners as commercialization efforts and integration with partner networks accelerate", the start of a "multi-provider orbital launch campaign following shipment of BlueBird 6 to India with

launch expected in first half of December", and a "[r]obust balance sheet with over $3.2 billion in cash, cash equivalents, restricted cash and liquidity, pro forma for convertible notes offering, monetized capped call, and aggregate proceeds and availability under the ATM facility (as of September 30, 2025)[.]"

56. Also on November 10, 2025, AST filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q3 ended September 30, 2025 (the "Q3 2025 10-Q"). The Q3 2025 10-Q stated, inter alia, that "[w]e believe our existing cash and cash equivalents on hand will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report."

57. Appended as exhibits to the Q3 2025 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

58. The statements referenced above were materially false and misleading as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than the Individual Defendants had signaled to investors; (ii) accordingly, the Individual Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals; (iii) even following the EchoStar Transaction, the Individual Defendants continued overstating AST's competitive position in the satellite D2C market; (iv) AST was experiencing slow user adoption in the U.S. and Japan; (v) the foregoing was likely to have a significant negative impact on the

Company's business and financial prospects; and (vi) as a result, the public statements were materially false and misleading at all relevant times.

59. On January 6, 2026, Scotiabank issued a report during post-market hours downgrading AST to a "Sell" recommendation, as well as its rating to "Sector Underperform" from "Sector Perform", citing, *inter alia*, significant competition from Starlink and slow customer adoption in the U.S. and Japan. Specifically, the Scotiabank report stated:

> **OUR TAKE: Negative.** Without yet a single retail customer and faced by the challenge of orbiting ~50 satellites to hit continuous service in a handful of markets in late 2026 or early 2027, ASTS's share price at US$97.60/share has once again overshoot [*sic*] to what we see as irrational levels (market cap of US$37B). Evidence of slow user adoption in the U.S. and Japan, modest ARPUs and high capex (including duplicated satellites for new frequencies) means investors may have to wait until 2028 or 2029 for tangible EFCF generation. Meanwhile, Starlink's accelerated fixed growth and global brand recognition means ASTS competes with a leader that already has, in terms of revenues, the equivalent of 340 million global DTC users (~680 million by the time ASTS launches in select markets). While it has been an ordeal for ASTS to launch seven satellites since 2017, in 2025 alone Starlink orbited 3,169 units . . . . [W]e . . . disagree with those dismissing ASTS's multi-year delays and Starlink's unstoppable growth. The middle-ground scenario points to a valuation range between US$45/share and US$55/share. **Sell.**
>
> * * *
>
> **We Believe ASTS Is Fairly Valued at Levels Closer to US$45-US$55 Per Share**
>
> The ASTS commercial launch in the U.S. may have to wait until early 2027, while carriers overseas may have to wait until 2028 or 2029. Our US$45.60/share target is based on EFCF of US$3.5B for 2028, supported by 225M paid subs under a global average ARPU of US$2.92/sub, not a conservative projection.
>
> Of note, in its 2025 report, Starlink reported 6M monthly users to its DTC [*i.e.*, D2C] services despite the company covering over 400M people (soon to expand to 1B with new markets such as Kazakhstan, Mexico, Mongolia, Peru, Switzerland, UK, Ukraine and Zambia). The service is already available in Australia, Canada, Chile, Japan, New Zealand and the United States. Projecting ASTS to have 225M paid subs by 2028 seems on the bullish side, especially if major carriers such as América Móvil decide to partner with Starlink (which is why we are following the Telcel move so closely).

> While TMUS [T-Mobile] did not provide specific numbers on DTC subscribers at the Q3/25 earnings release, early figures by KDDI in Japan suggest only 6% of the wireless base subscribed to the new service (it was launched earlier last year). Japan, however, is a highly penetrated market with impressive tower density (KDDI operates more towers than Vivo or TIMB in Brazil, a country with 21x Japan's landmass); we believe the DTC opportunity in other territories such as the Americas should be greater. But the point is that 225M paid subscribers by 2028 looks more on the aggressive side, and that current valuation at US$97.56/share is hard to back under rational EFCF projections.

60. Following the release of Scotiabank's report, AST's Class A common stock price fell $11.76 per share, or 12.06%, to close at $85.73 per share on January 7, 2026.

61. Then, on February 11, 2026, during post-market hours, AST issued a press release "announc[ing] its intent to offer . . . $1.0 billion aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", and that it "also intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150.0 million aggregate principal amount of Notes." The press release disclosed that the Company intended to use the net proceeds from the offering "for general corporate purposes, including without limitation, accelerating the deployment of our controlled spectrum bands on a global basis, monetizing the capabilities of our proprietary technology to capture the evolving commercial opportunities related to artificial intelligence, enhancing investment in government space opportunities in the U.S., reducing higher interest debt, and pursuing opportunistic investments to accelerate our SpaceMobile Service and capabilities."

62. The next day, during pre-market hours, AST issued another press release announcing the pricing of the foregoing notes offering at "an initial conversion price of approximately $116.30 per share of AST SpaceMobile's Class A common stock, which represents a premium of approximately 20% to the last reported sale price of AST SpaceMobile's Class A common stock on February 11, 2026."

63. Following these disclosures, AST's Class A common stock price fell $14.70 per share, or 15.17%, to close at $82.22 per share on February 12, 2026.

64. Despite the aforementioned declines in the Company's stock price, AST securities continued trading at artificially inflated prices because of the Individual Defendants' continued misstatements and omissions regarding, *inter alia*, the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals.

65. For example, on March 2, 2026, AST issued a press release providing a business update and Q4 and FY 2025 results. The press release quoted Defendant Avellan as stating, in relevant part, that "AST . . . significantly advanced all key aspects of our operations including commercial, government, manufacturing, spectrum rights, IP portfolio, and capital position[.]"

66. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, "revenue of $70.9 million for the full year 2025, driven by mobile network operator partners and the U.S. Government", and its "[r]obust balance sheet with over $3.9 billion in cash, cash equivalents, restricted cash and liquidity, pro forma for the convertible notes offering and availability under the ATM facility (as of December 31, 2025)[.]"

67. Also on March 2, 2026, AST filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for its Q4 and FY ended December 31, 2025 (the "2025 10-K"). The 2025 10-K contained the same statements as referenced above, regarding the competitive advantages AST purportedly enjoyed.

68. The 2025 10-K also stated that "[w]e believe our cash and cash equivalents on hand will be sufficient to meet our current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Annual Report."

69. Appended as exhibits to the 2025 10-K were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

70. On April 28, 2026, Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh filed the 2026 Proxy Statement, which sought shareholder approval of: (i) the re-election of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh to the Board; and (ii) the compensation paid to the Company's named executive officers.

71. Regarding the Company's Code of Conduct and "Corporate Governance Framework", the 2026 Proxy Statement stated the following:

> The Board has adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that, along with the Company's Second Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"), our Amended and Restated Bylaws ("Bylaws"), the charters of the committees of the Board (the "Committees") and our Amended and Restated Stockholders' Agreement (the "Stockholders' Agreement"), provide the framework for the governance of the Company. Our Code of Ethics applies to all of our directors, executive officers and employees, including our principal executive officer, principal financial officer, principal accounting officer and persons performing similar functions. The Code of Ethics is available on our corporate website at https://investors.ast-science.com. We intend to make any legally required disclosures regarding amendments to, or waivers of, provisions of our Code of Ethics on our website rather than by filing a Current Report on Form 8-K. The charters for all of our Committees as well as our Corporate Governance Guidelines are also available under the "Leadership and Governance" link under the heading "Investors" on our website at https://investors.ast-science.com.

72. Regarding the Company's "Risk Oversight," the 2026 Proxy Statement stated the following:

> Our Board is responsible for overseeing our risk management process. Our Board focuses on our general risk management strategy, the most significant risks facing us, and oversees the implementation of risk mitigation strategies by management. While our Board is ultimately responsible for overseeing our risk management process, certain committees assist our Board in overseeing parts of our overall risk management and regularly report to the Board regarding risk and the related risk

> management. During fiscal 2025, the Board's Committees assisted with the following responsibilities:
>
> • Audit Committee: Reviewing our accounting, reporting and financial practices, including the integrity of our financial statements and the oversight of our financial controls; and overseeing the Company's policies with respect to risk assessment and risk management, including overseeing management's implementation and execution of our cybersecurity risk management strategy and processes.
>
> * * *
>
> In addition, our Board receives periodic detailed operating performance reviews from management regarding certain risks and related management processes and procedures. The Board believes its current leadership structure enables it to fulfill its risk oversight function.

73. Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh caused the 2026 Proxy Statement to be false and misleading by failing to disclosed, *inter alia*, that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than the Individual Defendants had signaled to investors; (ii) accordingly, the Individual Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals; (iii) the Individual Defendants likewise overstated the durability of AST's competitive position in the satellite D2C market; (iv) AST was experiencing slow user adoption in the U.S. and Japan; and (v) the foregoing was likely to have a significant negative impact on the Company's business and financial prospects.

74. The 2026 Proxy Statement was also false and misleading because it failed to disclose that: (i) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (ii) contrary to the 2026 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not

adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

75. On the basis of the materially false and misleading 2026 Proxy Statement, shareholders voted to approve the re-election of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh to the Board, as well as approve executive compensation. Had shareholders known the truth—that the Board was not adequately overseeing risk and that the Individual Defendants were breaching their fiduciary duties to the Company—then they would not have voted to re-elect the individuals that were causing harm to the Company.

76. On May 11, 2026, AST issued a press release providing a business update and Q1 2026 results. The press release quoted Defendant Avellan as stating:

> AST SpaceMobile is accelerating manufacturing, regulatory progress, commercial partnerships, and government programs, ***furthering our position as the only technology positioned to capture the massive direct to device broadband opportunity in full***[.]
>
> * * *
>
> ***We have a robust global spectrum portfolio, the industry's largest global commercial ecosystem, and a fortress balance sheet, positioning us for success as we create the space-based cellular broadband market.***

77. The press release also touted various purported improvements to AST's commercial and financial position, including, inter alia, its "key assets – intellectual property, partnerships, balance sheet cash, access to shared MNO and MSS spectrum, over 500,000 square feet of manufacturing and operations space globally – to build and launch over 100 BlueBird satellites[.]"

78. Also on May 11, 2026, AST filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q1 ended March 31, 2026 (the "Q1 2026 10-Q"). The Q1 2026 10-Q stated, inter alia, that "[w]e believe our cash and cash equivalents on hand

will be sufficient to meet our current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report."

79. Appended as exhibits to the Q1 2026 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

80. The statements referenced above were materially false and misleading as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than the Individual Defendants had signaled to investors; (ii) accordingly, the Individual Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals; and (iii) as a result, the public statements were materially false and misleading at all relevant times.

81. On July 15, 2026, AST issued a press release during post-market hours "announc[ing] its intent to offer" yet another "$1.0 billion aggregate principal amount of convertible senior notes due 2034 (the 'Notes') in a private offering", and that it "intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150 million aggregate principal amount of Notes." The press release disclosed that AST intended to use the proceeds from the offering to, *inter alia*, "pursue an expanding universe of growth initiatives and secure additional access to orbit for its space-based cellular broadband network, including partnerships and/or acquisitions to further vertically integrate its business and mitigate risks associated with third-party launch providers." The press release further disclosed that the Company "currently does not have any understandings or agreements with respect to any such strategic transactions."

82. Later the same day, AST issued another press release announcing the pricing of the foregoing offering. Specifically, "$1.0 billion 1.625% convertible senior notes due 2034 . . . [at] an initial conversion price of approximately $79.57 per share of AST SpaceMobile's Class A common stock, which represents a premium of approximately 20.0% over the last reported sale price of AST SpaceMobile's Class A common stock on July 15, 2026", as well as "[c]apped call transactions . . . [at] an initial cap price of $149.20 per share of AST SpaceMobile's Class A common stock, which represents a premium of 125.0% over the last reported sale price of AST SpaceMobile's Class A common stock on July 15, 2026."

83. Following these disclosures, AST's Class A common stock price fell $11.30 per share, or 17.04%, to close at $55.01 per share on July 16, 2026. In addition, market analysts issued reports addressing these disclosures shortly afterwards, expressing caution with respect to the Company's business moving forward.

84. For example, also on July 16, 2026, UBS issued a report noting that "[t]he language [in the recent notes offering announcement] suggests a more vertically integrated business going forward, but visibility is limited and the company noted there are no agreements for strategic transactions in place." The UBS report further stated that while "[w]e believe AST will likely secure additional capacity with new launch providers following the Blue Origin test explosion in May," this would "potentially driv[e] up the $21-23M capital cost per satellite in the short term."

85. Similarly, on July 20, 2026, Roth Capital Partners ("Roth") issued a report addressing AST, observing that "[i]n Thursday's aftermath of a $1.1B convert, ASTS came under pressure (-17% Thursday vs. SPX down <1%) as investors wrestled with 'Why,' given the fully funded D2D [direct-to-device] constellation." In particular, the Roth report noted that, "[t]his past

week, the announcement of a $1.1B convert placed significant pressure on ASTS shares, as the action appeared to conflict with prior comments of the constellation being fully funded."

**INSIDER TRADING**

86. During the wrongful scheme described above, certain of the Company's insiders, on the basis of material, non-public information gained by virtue of their executive and directorial positions, sold copious amounts of their personally held AST stock at artificially inflated prices. In total, these insiders reaped more than $277.3 million.

87. Specifically: (i) Defendant Johnson sold 60,809 shares of Company Class A common stock on inside information, for which he received approximately $5.3 million in total proceeds; (ii) Defendant Mikitani sold 3,040,000 shares of Company Class A common stock on inside information, for which he received approximately $270.9 million in total proceeds; and (iii) Defendant Torres sold 15,000 shares of Company Class A common stock on inside information, for which he received approximately $1.1 million in total proceeds.

**DAMAGE TO THE COMPANY**

**Securities Class Action**

88. On September 14, 2026, a securities class action complaint was filed in the United States District Court for the Western District of Texas against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 in the case captioned in the case captioned: *Hunter v. AST SpaceMobile, Inc., et al.*, Case No. 7:26-cv-00378 (W.D. Tex.) (the "Securities Class Action").

89. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's

officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results

**Unjust Compensation**

90. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

91. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

92. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Insider Trading**

93. As alleged above, Defendants Johnson, Mikitani, and Torres each took advantage of material, non-public information and the Company's artificially inflated stock price to reap tens of millions of dollars in unlawful insider trades. As such, these unlawful trades and the profits obtained thereby are subject to complete disgorgement.

**Additional Damage to the Company**

94. As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars.

95. Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

96. In addition, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

97. As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## CORPORATE GOVERNANCE

98. Board members are held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

99. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AST, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

### Code of Conduct

100. At all relevant times, the Company had in place its Code of Conduct which "applies to the Company's directors, officers and other employees."

101. In a section entitled "Company Records," the Code of Conduct states:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.
>
> All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow the Company's Recordkeeping Policy.

102. In a section entitled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and the Company's policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.
>
> The Company's principal financial officers and other employees working in the finance department have a special responsibility to reasonably ensure that the Company's financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all applicable standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

103. In a section entitled "Compliance with Laws and Regulations," the Code of Conduct states:

> Each employee and director has an obligation to comply with all applicable laws, rules and regulations applicable to the Company's operations. These include without limitation, laws covering bribery and kickbacks, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor, the General Counsel or the Head of Compliance.

104. In a section entitled "Compliance with Insider Trading Laws," the Code of Conduct states:

> Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's General Counsel for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

105. In a section entitled "Public Communications and Regulation FD," the Code of Conduct states:

> The Company's policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.
>
> In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or the Company's stockholders, we must also disclose the information to the public. The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media on these topics. Any employee or director who is not a designated spokesperson of the Company is prohibited from communicating any information about the Company on these

topics to analysts, institutional investors, other stockholders or representatives of the media, except at the request of the Company's designated spokespersons.

106. The Individual Defendants failed to adhere to the Code of Ethics when they issued false and misleading statements and engaged in the wrongdoing described herein. Additionally, the Individual Defendant's failure to maintain the accuracy of Company records and reports, along with their failure to report other mismanagement, violates the sections regarding ethical obligations, confidentiality, and company assets.

**Audit Committee Charter**

107. At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee. The Audit Committee Charter provides that the Committee shall "oversee the accounting and financial reporting processes of AST SpaceMobile, Inc. (the 'Company') and the audits of the financial statements of the Company."

108. The Audit Committee Charter provides the following specific duties and responsibilities, with respect to financial statements and reporting:

*Annual Financial Statements and Annual Audit*

[]. Form 10-K Review. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall then recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

[]. Audit Committee Report. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

[]. Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the

Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

[]. Review of Earnings Releases. Discuss generally the Company's earnings press releases, including the type and presentation of information to be included, as well as the financial information and any earnings guidance provided to analysts in quarterly conference calls and to rating agencies.

[]. Risk Assessment and Risk Management. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

* * *

[]. Internal Control Over Financial Reporting and Disclosure Controls and Procedures. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct.

[]. Review Accounting Principles. To review with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements.

109. The Audit Committee failed to uphold their duties required by the Audit Committee Charter by failing to conduct oversight of the Company's engagement in the Individual Defendants' issuing false and misleading statements to the public. Furthermore, the Audit Committee violated the Audit Committee Charter by failing to maintain the accuracy of Company reports and records, failing to comply with laws and regulations, and failing to properly report violations to the rest of the Audit Committee.

## DUTIES OF THE DIRECTOR DEFENDANTS

110. As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business

practices and policies and assuring the integrity of its financial and business records.

111. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

112. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

113. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

114. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and

requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

115. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as

well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

116. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

117. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

118. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

119. Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

120. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and

useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

121. At the time this suit was filed, the Company's Board was comprised of ten (10) members – including Defendants Avellan, Johnson, Cisneros, Knapp, Sarnoff, Rubin, Torres, Ibbetson, Larson, and Wibergh. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

122. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

**THE DIRECTOR DEFENDANTS ARE**
**NOT INDEPENDENT OR DISINTERESTED**

123. As an initial point, the Company concedes in its 2026 Proxy Statement that just five (5) of its Board is independent, admitting that Defendants Avellan, Johnson, Knapp, Ibbetson, and Larson are not independent. As such, none of Defendants Avellan, Johnson, Knapp, Ibbetson, and Larson are capable of considering a demand.

124. Moreover, Because Defendant Avellan maintains majority voting power over the Company, the Company is a "controlled company" under the stock exchange listing standards meaning that the Company need not have a majority independent Board. Not only this, but Defendant Avellan maintains absolute control over the Board and the outcome of shareholder votes as he owns 100% of the Company's Class C Common Stock which, according to the Company's SEC filings, is entitled to 10 votes per share. Accordingly, the other Director Defendants could not

consider a demand to sue Defendant Avellan as that could have an adverse impact on their future re-election and continued service on the Board for which they receive lucrative compensation and benefits – particularly as, pursuant to a Stockholders' Agreement, Defendant Avellan has the right to nominate seven members (a majority) of the Board.

125. In addition, each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

126. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

127. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

128. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

129. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

130. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

131. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

132. Moreover, each of the Director Defendants solicited the false and misleading proxy statements which, among other things, secured the re-election of each of the Director Defendants to the Board on the basis of those materially false and misleading statements. Consequently, the Director Defendants were enabled to continue breaching their fiduciary duties to the Company. Not only do the Director Defendants face a substantial likelihood of liability for their role in issuing the false and misleading proxy statements, but they also received a material personal benefit through their re-election and continued receipt of director fees, access to information, and other benefits. Accordingly, the Director Defendants each lack independence.

133. Despite having knowledge of the history of their own misconduct and

mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Avellan**

134. Defendant Avellan is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Avellan cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

135. As CEO, Defendant Avellan also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Avellan could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Avellan is therefore futile.

136. Defendant Avellan also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Avellan is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

137. In addition, Defendant Avellan receives lucrative compensation in connection with his employment with the Company. Defendant Avellan is not independent from the directors serving on the Compensation Committee and who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Avellan. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to

the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Avellan could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

138. Because of Defendant Avellan's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Avellan is unable to comply with his fiduciary duties and prosecute this action. Defendant Avellan is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Johnson**

139. Defendant Johnson is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CLO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Johnson cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

140. As CLO, Defendant Johnson also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Johnson could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Johnson is therefore futile.

141. Defendant Johnson also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein,

Defendant Johnson is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

142. In addition, Defendant Johnson receives lucrative compensation in connection with his employment with the Company. Defendant Johnson is not independent from the directors serving on the Compensation Committee who are responsible for evaluating and determining the compensation of the executive officers, including Defendant Johnson. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its executive officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Johnson could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

**Defendants Johnson and Torres**

143. As discussed above, Defendants Johnson and Torres each used their material, non-public information about the Company to sell their personally held AST common stock at artificially inflated prices. In total, Defendants Johnson and Torres collectively reaped more than $6.4 million. Accordingly, Defendants Johnson and Torres face a substantial likelihood of liability for their insider trading.

144. Moreover, each of Defendants Johnson's and Torres' individual insider trading exceeds the materiality threshold under Delaware law. As such, they each received a material personal benefit from their insider trading and are therefore incapable of considering a demand.

**Defendants Rubin, Torres, Wibergh**

145. Defendants Rubin, Torres, and Wibergh, as members of the Audit Committee, reviewed and approved the improper statements. The Audit Committee's Charter provides that it

is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Defendants Rubin, Torres, and Wibergh were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.

146. Moreover, Defendants Rubin, Torres, and Wibergh reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, Defendants Rubin, Torres, and Wibergh caused these improper statements. Accordingly, Defendants Rubin, Torres, and Wibergh breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, Defendants Rubin, Torres, and Wibergh face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Additional Reasons Demand is Excused**

147. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

148. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

149. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

150. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

151. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

152. Publicly traded companies, such as AST, typically carry director and officer

liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

153. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

154. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

155. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

156. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

157. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

158. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

159. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

160. Defendants Johnson, Mikitani, and Torres also each breached their fiduciary duties to the Company by engaging in unlawful insider trading on the basis of material, non-public information while the Company's share price was artificially inflated. As a result of their insider trading, Defendants Johnson, Mikitani, and Torres collectively received hundreds of millions of dollars in trading proceeds.

161. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

162. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

163. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the

operations of a publicly held corporation.

164. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

165. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

168. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the unlawful actions.

169. As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against The Individual Defendants For Unjust Enrichment)**

170. Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

171. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

172. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

173. Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act

174. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175. Section 14(a) of the Exchange Act, 15 U.S.C. 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].”

176. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain “any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.” 17 C.F.R. § 240.14a-9.

177. The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

178. The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 and 2026 Proxy Statements, which were filed with the SEC. As alleged above, the Proxy Statements were materially false and misleading because contrary to representations, the Board did not perform informed oversight over the Company’s risk management processes, particularly as it related to financial reporting and risks related thereto. Moreover, the statements in the Proxy Statements were materially false and misleading because they failed to disclose that: (i) AST’s increasing capital requirements were likely to increase the Company’s debt load and share dilution with greater frequency and at greater scale than the Individual Defendants had signaled to investors; (ii) accordingly, the Individual Defendants had overstated the sufficiency of AST’s capital and liquidity position to achieve its strategic and business goals; (iii) the Individual Defendants likewise overstated the durability of AST’s competitive position in the satellite D2C market; (iv) AST was experiencing slow user adoption in the U.S. and Japan; and (v) the foregoing was likely to have a significant negative impact on the Company’s business and financial prospects.

179. The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the re-election of the Director Defendants, approving executive compensation.

180. The materially false and misleading statements contained in the Proxy Statements improperly induced shareholders to vote for the reelection of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company while continuing to reap director fees and breach their fiduciary duties to the Company.

181. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2026 Proxy Statement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment;

C. Awarding, against Defendants Johnson, Mikitani, and Torres, disgorgement of all illicitly gained proceeds as a result of their unlawful and disloyal insider trading;

D. Awarding, against the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of the Exchange Act;

E. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Awarding such other and further relief as is just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 5, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*
Saadia Hashmi (TX# 24139546)
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383

Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**VERIFICATION**

I, RAJINDER PAUL, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of AST SpaceMobile, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do no have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of AST SpaceMobile Inc. common stock at all relevant times.

Rajinder Paul

RAJINDER PAUL